JOURNAL ENTRY and OPINION
{¶ 1} Defendant-appellant Azzam Ahmed ("Ahmed") appeals his conviction and sentence relating to numerous sexual offenses. Finding some merit to the appeal, we affirm the convictions, but vacate the sentence and remand for resentencing.
 {¶ 2} Ahmed, a licensed obstetrician and gynecologist, operated medical offices in Parma, Newbury, and Twinsburg. In May 2003, he was charged with 27 counts of sexual imposition, 24 counts of sexual battery, and two counts of rape, involving 37 former patients. The alleged offenses occurred at Ahmed's offices while the victims were receiving medical treatment.
 {¶ 3} The matter proceeded to trial and the jury found Ahmed guilty on both rape counts, seven counts of sexual battery, and 11 counts of sexual imposition, but not guilty on the remaining 30 charges.[1] The trial court classified Ahmed a sexual predator and imposed the maximum prison term of ten years on each rape count, and five years on five counts of sexual battery, with all counts to run consecutively, for a total sentence of 45 years. The remaining two counts of sexual battery were merged with the two counts of rape. The trial court further imposed a $500 fine for each sexual imposition conviction, $10,000 for each sexual battery conviction, and $20,000 for each rape conviction and ordered Ahmed to pay court costs.
 {¶ 4} Ahmed appeals, raising sixteen assignments of error.
 Jurisdiction and Venue {¶ 5} In his first assignment of error, Ahmed argues that the trial court lacked jurisdiction over the 24 counts of the indictment involving offenses which occurred outside Cuyahoga County. He claims that the Cuyahoga County Grand Jury had authority to indict only on those offenses which were committed in Cuyahoga County. Because 24 counts occurred in other counties, namely, Summit and Geauga, he contends that the indictment never conferred jurisdiction on the trial court over these counts. We disagree.
 {¶ 6} R.C. 2901.11 grants jurisdiction to Ohio courts over criminal offenses which occur in Ohio. The statute provides that "[a] person is subject to criminal prosecution and punishment in this state if * * * [t]he person commits an offense under the laws of this state, any element of which takes place in the state." R.C. 2901.11(A)(1).[2] In the instant case, Ahmed was indicted on 53 counts of sexual offenses, all occurring in Ohio. Accordingly, pursuant to R.C. 2901.11, the trial court had jurisdiction to proceed on all counts.
 {¶ 7} Contrary to Ahmed's assertion, we do not find that the trial court's jurisdiction is governed by R.C. 2939.08, which provides:
"After the charge of the court of common pleas, the grand jury shallretire with the officer appointed to attend it, and proceed to inquire ofand present all offenses committed within the county."
 {¶ 8} This statute is not a jurisdictional statute; rather, it pertains to the duty of the grand jury. While the statute broadly defines the duty of the grand jury, it does not govern its exclusive authority. Moreover, we find that this statute cannot be considered in isolation.
 {¶ 9} Ohio's venue statute, R.C. 2901.12, provides that "[t]he trial of a criminal case in this state shall be held in a court having jurisdiction of the subject matter, and in the territory of which the offense or any element of the offense was committed." R.C. 2901.12(A). However, in recognizing the modern mobility of criminal offenders and the interest of judicial economy, the statute further provides:
"When an offender, as part of a course of criminal conduct, commitsoffenses in different jurisdictions, the offender may be tried for all ofthose offenses in any jurisdiction in which one of those offenses or anyelement of one of those offenses occurred."
R.C. 2901.12(H).
 {¶ 10} Further, Article I, Section 10 of the Ohio Constitution provides that "no person shall be held to answer for a capital, or otherwise infamous, crime, unless on presentment or indictment of a grand jury." While we agree that the State was required to obtain an indictment from the grand jury on the offenses alleged, we find no constitutional requirement that limits a grand jury from indicting only on offenses that occurred in the county in which it resides when the additional offenses presented are part of the same course of criminal conduct. See State v.Centers (July 19, 1983), Delaware App. No. 82-CA-38 (Putman, J., dissenting). Further, Article 4, Section 18 of the Ohio Constitution recognizes that Ohio courts shall "have and exercise such power and jurisdiction, at chambers, or otherwise, as may be directed by law." Because R.C. 2901.12(A) recognizes that an offender who commits offenses in different jurisdictions as part of a course of criminal conduct may be tried in any one of those jurisdictions, we find the same applies to the authority of the grand jury within those jurisdictions.
 {¶ 11} Accordingly, we find that a grand jury of one county has authority to indict on offenses occurring in other counties provided that those offenses are part of a course of criminal conduct. We disagree with Ahmed's contention that the only way the trial court could have obtained jurisdiction was through the consolidation of indictments obtained from each grand jury of the county where the offenses occurred. Rather, we find that constitutional, statutory, and case law impliedly authorize a grand jury to indict on offenses outside its county provided that such offenses are part of a course of criminal conduct involving the county where the grand jury resides. See R.C. 2901.11 and 2901.12(A); Art. 4, Sec. 18 Ohio Constitution.
 {¶ 12} Ahmed relies on the Ohio Supreme Court's decision in State v.Nevius (1947), 147 Ohio St. 263, for the proposition that a grand jury has authority to indict only for offenses which occurred in the county in which it resides. Ahmed claims that pursuant to Nevius, this court must dismiss the counts charging offenses which occurred outside Cuyahoga County. We find Ahmed's reliance on Nevius misplaced and the instant case distinguishable.
 {¶ 13} In Nevius, there was no allegation that the offenses occurred as part of a course of criminal conduct. Moreover, Nevius was decided before the enactment of R.C. 2901.12, which adopted a new rule stating that an offender whose course of criminal conduct affects different jurisdictions may be tried in any one of those jurisdictions. Thus,Nevius did not contemplate the General Assembly's amendment to the venue statute.
 {¶ 14} Furthermore, we find the Fifth Appellate District's decision inCenters, supra, to be unpersuasive. First, Centers is distinguishable because the defendant was indicted on 16 counts, involving seven different counties, but not the county in which the grand jury returned the indictment.[3] In the instant case, Ahmed was indicted on 29 counts which occurred in Cuyahoga County, with the remaining counts occurring outside Cuyahoga County but as part of the same course of criminal conduct. Next, we disagree with the Centers court's reliance on Nevius,
without any consideration of the amendment to the venue statute. UnlikeCenters, we find that Ohio's jurisdictional statute, R.C. 2901.11, and venue statute, R.C. 2901.12, allow a grand jury to consider additional offenses that occurred outside its county, provided that the offenses are part of the same course of criminal conduct which took place in the county in which the grand jury resides. In focusing on the duty of the grand jury, the Centers court ignored R.C. 2901.11, and incorrectly determined that a grand jury has authority to indict on only those offenses occurring in its county.
 {¶ 15} Ahmed also claims that the trial court should have dismissed the 24 counts which occurred outside Cuyahoga County because the indictment misidentified the location of these offenses. However, our review of the record reveals that the State moved to amend the indictment prior to trial to reflect the proper county for each offense and to indicate that these offenses were committed as part of a course of criminal conduct in the three counties, i.e., Cuyahoga, Geauga, and Summit. Because the amendment did not affect a material element of the offenses and the State's bill of particulars had already identified the city in which each offense occurred, we find no prejudice to the defense by the amendment. See R.C. 2941.30; Crim.R. 7(D).
 {¶ 16} Next, Ahmed argues that the jury never made any determination as to venue nor that the State proved that the offenses constituted a course of criminal conduct. However, "venue need not be proved in express terms so long as it is established by all the facts and circumstances in the case." State v. Headley (1983), 6 Ohio St.3d 475, 477. As long as there was substantial evidence from which the jury could have determined beyond a reasonable doubt that one of the alleged offenses was committed in Cuyahoga County as part of a course of criminal conduct, then this court must find that venue was properly established. See State v. Danzy
(May 24, 1991), Erie App. No. E-89-40, citing State v. Brown (1988),38 Ohio St.3d 305, paragraph four of the syllabus, certiorari denied (1989), 489 U.S. 1040.
 {¶ 17} R.C. 2901.12(H) defines the following as prima facie evidence of a course of criminal conduct:
"(1) The offenses involved the same victim, or victims of the same typeor from the same group.
 (2) The offenses were committed by the offender in the offender's sameemployment, or capacity, or relationship to another.
• * *
(5) The offenses involved the same or a similar modus operandi."
 {¶ 18} The evidence at trial revealed that all of the victims were Ahmed's patients, all of the offenses occurred at his medical offices while the victims were seeking medical care from him, and while situated in a vulnerable position. Further, each victim identified the office location where the offense(s) occurred. Based on this evidence, we find that the State adequately proved that venue was proper. See, e.g., Statev. Newland (June 17, 1998), Sandusky App. No. C.A. No. S-87-34 (course of criminal conduct was proven by evidence that defendant committed a series of thefts from six separate Eagles Clubs involving six counties over the course of eighteen months where the defendant was a member of the Eagles Club and utilized the same method to commit each offense); State v.Lyons (Oct. 13, 1993), Holmes App. No. CA-476 (venue was proper under R.C. 2901.12(H)(1), (2), and (5) where defendant-customer wrote bad checks to merchants in three counties).
 {¶ 19} Accordingly, the first assignment of error is overruled.
 Prejudicial Joinder {¶ 20} In his second assignment of error, Ahmed contends that the trial court should have severed all of the counts relating to different victims, or in the alternative, the rape counts involving Jane Doe #33. He claims that the sheer number of the counts alleged against him allowed the State to prosecute its case "by way of shock value and by hammering the message that 37 victims can't all be wrong," thereby relieving the State of its burden of proving each element of the offenses. He further argues that the joinder was prejudicial because there was no way for the jury to accurately recall the testimony of witnesses after sitting through weeks of trial.
 {¶ 21} Generally, the law favors joining multiple offenses in a single trial under Crim.R. 8(A) if the offenses charged are of the same or similar character. State v. Lott (1990), 51 Ohio St.3d 160, 163. As the Ohio Supreme Court stated in State v. Torres (1981), 66 Ohio St.2d 340, "joinder and the avoidance of multiple trials is favored for many reasons, among which are conserving time and expense, diminishing the inconvenience to witnesses and minimizing the possibility of incongruous results in successive trials before different juries."
 {¶ 22} However, if joinder would prejudice a defendant, the trial court is required to order separate trials. Crim.R. 14. It is the defendant who bears the burden of demonstrating prejudice and that the trial court abused its discretion in denying severance. State v. Hill,
Cuyahoga App. No. 80582, 2002-Ohio-4585, citing State v. Coley,93 Ohio St.3d 253, 2001-Ohio-1340. A defendant's claim of prejudice is negated when: (1) evidence of the other crimes would have been admissible as "other acts" evidence under Evid.R. 404(B) or (2) the evidence of each crime joined at trial is simple and direct. Lott, supra, at 163; see, also, State v. Schaim, 65 Ohio St.3d 51, 59, 1992-Ohio-31; State v.Franklin (1991), 62 Ohio St.3d 118, 122.
 {¶ 23} Under Evid.R. 404(B), "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."
 {¶ 24} Likewise, R.C. 2945.59 provides:
"In any criminal case in which the defendant's motive or intent, theabsence of mistake or accident on his part, or the defendant's scheme,plan, or system in doing an act is material, any acts of the defendantwhich tend to show his motive or intent, the absence of mistake oraccident on his part, or the defendant's scheme, plan, or system in doingthe act in question may be proved, whether they are contemporaneous withor prior or subsequent thereto, notwithstanding that such proof may showor tend to show the commission of another crime by the defendant."
 {¶ 25} Contrary to Ahmed's assertion, we find no prejudice in the joinder of the offenses. Notably, the jury acquitted Ahmed of 30 of 50 counts in the indictment. Thus, the jury was obviously not overly influenced by the number of counts against him. Moreover, we find that the evidence of each sexual offense would have been admissible at separate trials under Evid.R. 404(B) in order to prove Ahmed's motive, intent, and plan. See State v. Cornell (Nov. 27, 1991), Cuyahoga App. No. 59365.
 {¶ 26} Further, although we recognize that there was a considerable amount of evidence for the jury to evaluate, the evidence presented was simple and direct. Each victim testified as to the specific facts giving rise to her separate charges against Ahmed. Moreover, we find no merit to Ahmed's contention that the volume of the evidence impeded the jury's ability to recall witnesses' testimony. Indeed, the jury's verdict demonstrates that it was able to keep track of the evidence.
 {¶ 27} The second assignment of error is overruled.
 Admission of Expert Witness {¶ 28} Ahmed argues in his third assignment of error that the trial court abused its discretion in allowing Margo James to testify as an expert witness on the issue of the general behavior of sexual abuse victims. He claims that James was not qualified to testify as an expert and that her testimony lacked any "solid empirical foundation."
 {¶ 29} Evid.R. 702 governs the admissibility of expert witnesses and provides in pertinent part:
"A witness may testify as an expert if all of the following apply:
 "(A) The witness' testimony either relates to matters beyond theknowledge or experience possessed by lay persons or dispels amisconception common among lay persons;
 (B) The witness is qualified as an expert by specialized knowledge,skill, experience, training, or education regarding the subject matter ofthe testimony;
 (C) The witness' testimony is based on reliable scientific, technical,or other specialized information. * * * "
 {¶ 30} Additionally, pursuant to Evid.R. 104(A), "the trial court must make a threshold determination regarding the qualifications of the witness to testify as an expert witness before it permits expert testimony." State v. O'Linn (Mar. 16, 2000), Cuyahoga App. No. 75815, citing Scott v. Yates (1994), 71 Ohio St. 3d 219, 221. The decision to admit expert testimony rests within the sound discretion of the trial court and will not be overturned absent an abuse of discretion. State v.Allen, 73 Ohio St. 3d 626, 633, 1995-Ohio-283.
 {¶ 31} Our review of the record indicates that James was qualified as an expert on the behavior of sexual abuse victims. She testified that she is a clinical social worker who has counseled hundreds of victims of sexual assault. At the time of trial, James was operating her own clinical practice where, in addition to other areas of treatment, she worked with victims of sex abuse. Further, her credentials and educational background include a bachelor's degree in nursing and psychology and a master's degree in social science administration, mental health treatment. Based on this experience and training, we find that the trial court did not abuse its discretion in allowing James to testify as an expert. See State v. Dial, Cuyahoga App. No. 83847, 2004-Ohio-5860 (social worker qualified as an expert based on her experience counseling over 100 child victims of sex abuse, masters degree in social work and completion of 30 to 60 hours of continuing education); State v. Davis
(1989), 64 Ohio App.3d 334 (counselor's bachelor and masters degrees in psychology and experience as a counselor was sufficient to qualify her as an expert).
 {¶ 32} We find no merit to Ahmed's contention that James' testimony should have been stricken because it was not based on any "solid empirical foundation." In the instant case, James did not testify on a specific "theory" or "syndrome" for purposes of demonstrating that the victims were sexually assaulted or that they were telling the truth. Rather, her testimony pertained to the general characteristics of sexual abuse victims, without regard to any of the victim's specific testimony. Ohio courts have consistently recognized that a trained social worker may testify as an expert on the general characteristics and behavior involving sexual abuse, pursuant to his or her experience in dealing with sexual abuse victims, provided that the expert does not testify on the credibility of the victim. Cf. State v. Macias (June 8, 2001), Lucas App. No. L-99-1363; State v. Garfield (1986), 34 Ohio App.3d 300. See, also Landskroner v. Pub. Util. Comm. (1983), 5 Ohio St.3d 96, 97 ("the fact that an expert testifies from personal knowledge does not remove him from the classification of an expert witness"). Thus, given the nature of James' testimony, we find that her experience and education sufficiently supported her expert testimony.
 {¶ 33} However, even if we were to find that the trial court should have stricken her testimony, it is clear from the record that the jury gave little weight to her testimony. The State offered James as an expert on the issue of why a victim would return to see an "abuser" after an incident of sexual abuse had occurred. Eleven victims testified that they returned to see Ahmed for further medical treatment after the alleged offenses occurred. However, the jury acquitted Ahmed of all charges involving nine of the eleven victims. In regard to the counts relating to the other victims, there were unique circumstances attendant to those victims which were not addressed by James' testimony.[4] Accordingly, we find that the admission of the testimony was, at best, harmless error under Crim.R. 52. See State v. Brown, 65 Ohio St.3d 483, 485, 1992-Ohio-61
("Where there is no reasonable possibility that unlawful testimony contributed to a conviction, the error is harmless and therefore will not be grounds for reversal.").
 {¶ 34} The third assignment of error is overruled.
 Rape Counts {¶ 35} In his fourth assignment of error, Ahmed argues that the jury's verdict on the rape counts is not supported by the sufficiency or weight of the evidence.
 {¶ 36} Crim.R. 29(A) governs motions for acquittal and provides for a judgment of acquittal if the evidence is insufficient to sustain a conviction. An appellate court's function in reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. State v. Jenks (1991), 61 Ohio St.3d 259, 273. A verdict will not be disturbed on appeal unless reasonable minds could not reach the conclusion reached by the trier of fact. Id.
 {¶ 37} In essence, sufficiency is a test of adequacy. State v.Thompkins, 78 Ohio St.3d 380, 386-387, 1997-Ohio-52. A criminal conviction is not supported by sufficient evidence when the prosecution has failed to "prove beyond a reasonable doubt every fact necessary to constitute any crime for which it prosecutes a defendant." State v.Robinson (1976), 47 Ohio St.2d 103, 108, citing In re Winship (1970),397 U.S. 358. The weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact to determine. State v.DeHass (1967), 10 Ohio St.2d 230, 231.
 {¶ 38} When the argument is made that the conviction is against the manifest weight of the evidence, the appellate court is obliged to consider the weight of the evidence, not its mere legal sufficiency. As the Ohio Supreme Court declared:
"Weight of the evidence concerns `the inclination of the greater amountof credible evidence offered in a trial, to support one side of the issuerather than the other. It indicates clearly to the jury that the partyhaving the burden of proof will be entitled to their verdict, if, onweighing the evidence in their minds, they shall find the greater amountof credible evidence sustains the issue which is to be established beforethem. Weight is not a question of mathematics, but depends on its effectin inducing belief.' * * *
 The court, reviewing the entire record, weighs the evidence and allreasonable inferences, considers the credibility of witnesses anddetermines whether in resolving conflicts in the evidence, the juryclearly lost its way and created such a manifest miscarriage of justicethat the conviction must be reversed and a new trial ordered. Thediscretionary power to grant a new trial should be exercised only in theexceptional case in which the evidence weighs heavily against theconviction." Thompkins, supra, at 387.
 {¶ 39} A reviewing court will not reverse a verdict where the trier of fact could reasonably conclude from substantial evidence that the prosecution proved the offense beyond a reasonable doubt. State v. Eley
(1978), 56 Ohio St.2d 169, 383 N.E.2d 132. Additionally, circumstantial evidence and direct evidence inherently possess the same probative value and, therefore, should be subjected to the same standard. Jenks, supra.
 {¶ 40} Ahmed argues that the State offered no evidence that the alleged rape victim ("C.C.") did not knowingly and voluntarily consent to sexual relations. He urges this court to reverse his convictions because C.C. testified that she was not raped. However, Ahmed was convicted of two counts of rape under R.C. 2907.02(A)(1)(c), which provides:
"(A) (1) No person shall engage in sexual conduct with anotherwho is not the spouse of the offender or who is the spouse of theoffender but is living separate and apart from the offender, whenany of the following applies:
* *
(c) The other person's ability to resist or consent is substantiallyimpaired because of a mental or physical condition or because of advancedage, and the offender knows or has reasonable cause to believe that theother person's ability to resist or consent is substantially impairedbecause of a mental or physical condition or because of advanced age."
 {¶ 41} Thus, a person's subjective belief that he or she was not raped does not defeat a rape conviction under this section when the evidence reveals that the person's ability to resist or consent was substantially impaired because of a mental or physical condition.
 {¶ 42} Ahmed claims that the State failed to prove that C.C.'s ability to resist or consent was substantially impaired. He argues that the State failed to produce any expert testimony on the issue and merely relied on C.C.'s testimony about her depression. Expert testimony, however, is not required to establish the element of "substantial impairment" due to a mental condition under R.C. 2907.02(A)(1)(c). State v. Tate (Oct. 26, 2000), Cuyahoga App. No. 77462, citing State v. Zeh (1987),31 Ohio St.3d 99, 105. Rather, the element may be proven through the testimony of the victim and by allowing the trier of fact to make its own assessment of the victim's ability to either appraise or control her conduct. Tate, supra, citing State v. Ferguson (May 25, 2000), Franklin App. No. 99AP-819.
 {¶ 43} In the instant case, the State produced evidence that C.C. was Ahmed's patient for approximately four years and that she highly respected him. In addition to seeking gynecological care from Ahmed, she relied on him for psychological treatment. In early June 2002, Ahmed helped arrange for C.C. to be admitted to the hospital after she attempted suicide. The day after she was released from the hospital, she saw Ahmed at his Twinsburg office and scheduled a tubal ligation surgery. A week following the surgery, on June 17, 2002, C.C. returned to Ahmed's office for a postoperative visit, which included an internal exam.
 {¶ 44} C.C. testified that Ahmed began the internal exam, and while she was lying on the examining table with her feet in stirrups, "he just stopped" and "started to perform oral sex." (Tr. 2841). While crying and in a state of shock, C.C. sat up, said "no," and asked Ahmed why he was doing this. He proceeded to lubricate his fingers with gel and placed them inside C.C. and began stimulating her. Still crying, C.C. told him that none of it felt "real." Next, Ahmed helped her off the table and onto his lap and eventually penetrated her vagina with his penis and climaxed.
 {¶ 45} C.C. returned to see Ahmed approximately one week later. She testified that she wanted to ask him whether they really had sex or whether she had imagined it. She believed that the medication she was taking at that time might have made her delusional. In response to her question, Ahmed confirmed that they had sex during her previous appointment. In describing what happened next, C.C. testified:
"I got down off the table and went to get my purse when he grabbed myarm. * * * He had his penis out and had me perform oral sex on him."(Tr. 2850).
 {¶ 46} C.C. further testified that she was still suicidal from the first episode and that, after the second incident, she felt even more desperate.
 {¶ 47} Following Ahmed's arrest in August 2002 on allegations of sexual misconduct involving another patient, C.C. contacted the police in September and reported the incidents. She also turned over the underwear that she had worn during the first incident, which the police later determined contained Ahmed's semen.
 {¶ 48} In the spring of 2003, C.C. contacted Ahmed to discuss the situation. She testified that, in addition to needing closure and wanting to know why the incidents happened, she was concerned about Ahmed's well-being and did not want him to get in trouble. (Tr. 2859). In her conversation with Ahmed, he told her to retrieve her underwear from the police and to tell the police that she had placed his semen on her underwear.
 {¶ 49} In answering the State's question as to whether the acts were consensual, C.C. responded: "I don't think so, no." She further explained:
" * * * I didn't even have the right mind. I mean I was on a one trackto suicide. I think I even asked him, well, how many pills did I need totake, because the first time I was just on coma watch the first fewdays, what did I need to do to make it final." (Tr. 2866).
 {¶ 50} On cross-examination, C.C. admitted that, when she reported the incidents, she was unsure whether a crime had been committed. She further testified that she contacted the police and prosecution following her initial report and told them that she made a mistake by coming forward. She also admitted that she felt incredible pressure form the prosecutor to pursue the case. In response to defense counsel's questions regarding consent, she denied that it was consensual and denied telling defense counsel the same. (Tr. 2893).
 {¶ 51} However, later in the trial, C.C. recanted this testimony and stated that the sexual acts were consensual on the basis that she believed that she "could have stopped it." (Tr. 4195). Although C.C. recanted her earlier testimony regarding consent, she consistently testified that she was suicidal and that her "mental outlook" was impaired. In response to the State's questions as to why she believed she could have stopped Ahmed, she indicated that "it didn't seem to matter." She also reiterated that she "didn't care about having sex" because she "intended on committing suicide the right way."
 {¶ 52} In light of C.C.'s testimony concerning her mental state during both office visits, we find that there was sufficient evidence for the jury to find beyond a reasonable doubt that her ability to consent or resist was substantially impaired. Moreover, given the fact that Ahmed had been providing her with psychiatric treatment and was aware of her recent suicide attempt, the jury could have easily concluded that Ahmed was aware of C.C.'s mental condition. Thus, the trial court properly denied Ahmed's motion for acquittal on the rape counts.
 {¶ 53} Similarly, we find that the convictions are supported by the weight of the evidence. C.C.'s testimony revealed that she was extremely vulnerable and distraught at the time of each incident. Moreover, testimony was offered that C.C. depended on Ahmed as her "lifeline." C.C.'s emotional dependence on Ahmed, coupled with her state of mind demonstrated that her judgment was substantially impaired. Ahmed was not only aware of her condition but he took advantage of it by engaging in sexual relations with C.C.
 {¶ 54} We further note that C.C.'s later recantation that the acts were consensual does not negate the State's evidence that her ability to consent or resist was substantially impaired. On cross-examination by the State, C.C. acknowledged that she returned to Ahmed's office on June 25 to confirm whether they had sexual relations during the previous appointment. Due to her mental condition at the time, she was unsure whether she had imagined the sexual acts. She further reiterated her earlier testimony as to what happened during the June 17 visit, including the fact that she was crying, that her "mental outlook" was not right, and that nothing felt "real." In regard to the second visit, she testified that she was upset during the visit, that she was confused by Ahmed's actions, that she was still in a "dream state," and that she did not care that day whether she had sex with Ahmed because she "had every intention of committing suicide the right way." Furthermore, she reiterated that, although she returned to Ahmed's office, she did not want to have sexual relations. We find that this testimony, taken in its entirety, demonstrates that C.C.'s ability to consent or resist was substantially impaired.
 {¶ 55} Moreover, her rebuttal testimony, relating to both incidents, was consistent with her earlier testimony on direct, although she later testified that she believed the sex was consensual because she could have stopped Ahmed. However, we find that her explanation as to why she believed she could have stopped Ahmed from performing the sexual acts further demonstrates her impaired judgment. C.C. testified that she did not stop Ahmed because "[i]t didn't seem to matter. And I needed the doctor." Considering this testimony in conjunction with her repeated statements that her "mental outlook was not right," that nothing seemed "real," and that she was suicidal, we cannot say that the jury clearly lost its way in finding that C.C.'s ability to consent or resist was substantially impaired due to her mental condition. Further, because it is undisputed that the sexual acts occurred, we find that the convictions are supported by the weight of the evidence.[5]
 {¶ 56} Accordingly, we overrule the fourth assignment of error.
 Prosecutorial Misconduct {¶ 57} In his fifth assignment of error, Ahmed argues that he was denied a fair trial because of prosecutorial misconduct.
 {¶ 58} A prosecuting attorney's conduct during trial does not constitute grounds for error unless the conduct deprives the defendant of a fair trial. State v. Keenan (1993), 66 Ohio St.3d 402-405; State v.Gest (1995), 108 Ohio App.3d 248, 257. The touchstone of a due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor. Smith v.Phillips (1982), 455 U.S. 209. The effect of the prosecutor's misconduct must be considered in light of the whole trial. State v. Durr (1991),58 Ohio St.3d 86, 94; State v. Maurer (1984), 15 Ohio App.3d 239, 266.
 {¶ 59} Ahmed claims that the State, while cross-examining Christina Kling, a character witness for the defense, falsely stated that he lost his medical privileges at Southwest Hospital and improperly implied that the revocation was due to sexual misconduct. He contends that the State knew this statement was not true. Ahmed further argues that the State's purported reliance on Stacey Peck-Dusman's claim that she was treated by Ahmed at Southwest Hospital in 1990, despite Southwest Hospital's written representation that he never had privileges, constitutes prosecutorial misconduct. Ahmed complains of the following cross-examination of Christina Kling by the prosecutor:
"Q. * * * Ma'am, you said you worked at Southwest?
 A. Yes
 Q. As a registered nurse?
 A. Yes.
 Q. And how long has that been?
 A. Two years.
 Q. So you have no knowledge of when the doctor had privileges atSouthwest?
 A. No.
 Q. Did you know that he had privileges at Southwest at some point intime?
 A. No, I did not.
 Q. Did you know that those privileges were revoked —
 [Defense counsel]: Objection.
 The Court: Overruled.
 A. No, I did not.
 Q. — that they were revoked about 1990, 1991?
 [Defense counsel]: Objection
* *
The Court: Sustained.
 Q. Did you realize that there were sexual allegations —
 [Defense counsel]: Objection, Your Honor. May we approach the side bar?That is wrong, incorrect." (Tr. 3742-3743).
 {¶ 60} Although we agree that the State acted improperly in this line of questioning and that its reliance on the testimony of an alleged patient, Stacey Peck-Dusman, over the express representation of the hospital,[6] amounted to prosecutorial misconduct, we cannot say that it deprived Ahmed of a fair trial. See State v. Lott (1990),51 Ohio St.3d 160, 166 (a prosecutor's misconduct in making misleading comments and discussing matters unsupported by the record was not grounds for reversal where defendant failed to show prejudice). Here, defense counsel effectively rebutted any claim that Ahmed had privileges at the hospital through the testimony of Southwest Hospital employees, Susan Ferrante, Administrator of Risk Management and Safety Services, and Saundra Rodriguez, Administrator of Medical Staff Services. Both witnesses testified that Ahmed was never on staff at Southwest nor did he have privileges with the hospital. Ferrante further testified that Ahmed never treated Stacey Peck-Dusman nor did the hospital have any record of any complaints made by her concerning Ahmed. Accordingly, Peck-Dusman's testimony that Ahmed treated her in 1990 at Southwest Hospital and that she had reported his alleged mistreatment to the hospital was contradicted by both her medical records and the testimony of two hospital administrators.
 {¶ 61} Moreover, the record reveals that, immediately following the questioning, defense counsel objected and the State ultimately withdrew its question relating to the allegations of sexual misconduct.
 {¶ 62} When considering the impact of the prosecutor's statement in the context of the entire lengthy trial, we cannot say that Ahmed was denied a fair trial. First, any prejudice that would ordinarily be associated with such a misrepresentation was effectively cured by the defense's rebuttal witnesses. Second, the State's reliance on Peck-Dusman's testimony as corroborating evidence, without having any confirmation from Southwest Hospital or corresponding medical records, undermined the integrity of its case to the jury. Thus, the prosecutor's misconduct may have actually assisted the defense in demonstrating that the State acted rashly without properly investigating all the allegations against Ahmed. Accordingly, although we disapprove of the prosecutor's conduct, we find that it did not prejudice Ahmed as to deny a fair trial.
 {¶ 63} Next, Ahmed cites other instances of the State's alleged misconduct which he claims deprived him of a fair trial. First, he claims that the State improperly asked a victim whether she knew his "civil attorney." This question was asked on redirect, following defense counsel's numerous questions relating to the victim's retention of a civil attorney. Although we find the question irrelevant to the State's case, we find no prejudice.
 {¶ 64} Second, Ahmed claims that the State physically threatened him and his counsel in a heated exchange before the court regarding the admissibility of evidence. While both parties may have lost their composure in defending their respective positions, we find no physical threat was made. Further, Ahmed suffered no prejudice by the remarks because they were made outside the jury's presence. As to his contention that the prosecutor improperly pointed and screamed at Ahmed and walked behind the defense trial table, we find no support in the record other than defense counsel's assertions. We note that Ahmed never objected to this alleged conduct while it was occurring and, although defense counsel later complained of the conduct outside the presence of the jury, the trial court had no recollection of any such conduct.
 {¶ 65} Third, Ahmed claims that the State improperly pressured C.C. to testify and to dismiss her civil suit against Ahmed and that it coached her to cry on the witness stand. Contrary to Ahmed's contention, we find no evidence in the record that the State "coached" C.C. nor improperly pressured her to dismiss her civil suit. Further, we find its reliance on C.C.'s testimony for the prosecution of its case was proper. The State's duty to prosecute offenses does not depend on the discretion of victims.
 {¶ 66} Likewise, we find no misconduct in the State's cross-examination of defense character witness, Barbara Wasko. Ahmed contends that it was improper for the State to ask Wasko if her opinion of Ahmed would change if she learned that he had "in fact sexually assaulted one of his patients" or that he had "raped one of his patients." Because the witness testified as to Ahmed's character, the State was permitted to ask hypothetical questions, exposing the witness' bias toward Ahmed and attacking her credibility.
 {¶ 67} Ahmed also claims that the State acted improperly by waiting until the close of its case to dismiss three counts, involving three victims who did not appear for trial. However, we find no prosecutorial misconduct in such action. The State expected the victims to testify and, once it became apparent that the victims were not going to appear for trial, the State properly dismissed the counts.
 {¶ 68} Next, Ahmed contends that the State acted improperly by calling a rebuttal witness without first investigating the veracity of her story. Again, Ahmed suffered no prejudice from the State's actions because the jury was free to discount the witness's credibility.
 {¶ 69} Ahmed also claims that the State improperly accused him of "altering records." However, we find no merit to this argument because the State presented evidence that the office sign-in sheets were altered.
 {¶ 70} Finally, we find no merit to Ahmed's contention that he was prejudiced by the State's reference to 100 accusations made against him because the trial court provided a curative instruction following the comment.
 {¶ 71} Accordingly, although we find that the State acted improperly during a portion of Ahmed's five-week trial, we find that Ahmed was afforded a fair trial.
 {¶ 72} The fifth assignment of error is overruled.
 Complaints filed with the State Medical Board {¶ 73} Ahmed argues in his sixth assignment of error that the trial court violated his Sixth Amendment right to confront witnesses by improperly allowing testimony concerning complaints made to the State Medical Board. He claims that the admission of such hearsay testimony, on rebuttal, was overly prejudicial. In response, the State contends that the testimony was not hearsay because it was not offered for the truth of the matter, but, rather, to demonstrate that complaints had been filed. We agree.
 {¶ 74} The record reveals that the State offered the testimony of William Schmidt, Assistant Executive Director of the State Medical Board, to rebut the defense's evidence that Ahmed had an excellent reputation among his patients for many years. Schmidt testified that two complaints were filed against Ahmed in 1995, which the Board investigated and found insufficient evidence to bring any formal disciplinary action. As a result of the complaints, the Board cautioned Ahmed regarding his language and interaction with patients and reminded him to keep a chaperone in the room during internal examinations. Schmidt further testified that additional complaints had been filed after 2000, which had been stayed pending the resolution of the criminal case.
 {¶ 75} We find that this testimony does not constitute hearsay. See Evid.R. 801(C) ("hearsay" is defined as an out-of-court statement that is "offered for the truth of the matter asserted"). Here, the testimony was offered for purposes of demonstrating that complaints had been filed and not for the veracity of any complaints. Further, because the testimony was not hearsay, Ahmed's right to confrontation was not violated. SeeState v. Shields (Jan. 11, 1989), Summit App. No. 13630, citing Ohio v.Roberts (1980), 448 U.S. 56, 66.
 {¶ 76} Moreover, even if we were to find that the trial court erred in admitting this testimony, we find no prejudice to Ahmed. Schmidt testified that there was insufficient evidence to initiate any formal proceedings against Ahmed. Further, Schmidt testified on cross-examination that the complainants had initiated civil suits but did not prevail.
 {¶ 77} Accordingly, the sixth assignment of error is overruled.
 Trial Court's Alleged Bias {¶ 78} In his seventh assignment of error, Ahmed argues that the trial court denied him a fair trial because it was biased in favor of the State.
 {¶ 79} "It is well settled that a criminal trial before a biased judge is fundamentally unfair and denies a defendant due process of law." Statev. Lamar, 95 Ohio St.3d 181, 189, 2002-Ohio-2128, citing Rose v. Clark
(1986), 478 U.S. 570, 577; Tumey v. Ohio (1927), 273 U.S. 510, 534. Judicial bias has been described as "a hostile feeling or spirit of ill will or undue friendship or favoritism toward one of the litigants or his attorney, with the formation of a fixed anticipatory judgment on the part of the judge, as contradistinguished from an open state of mind which will be governed by the law and the facts." Id., quoting State ex rel.Pratt v. Weygandt (1956), 164 Ohio St. 463, paragraph four of the syllabus.
 {¶ 80} Ahmed refers to numerous examples in which the trial court allegedly demonstrated bias through its improper rulings on objections and the admission of evidence. Notably, Ahmed does not claim that the referenced evidentiary rulings on their own constitute reversible error. Rather, in light of these alleged erroneous rulings, he urges this court to find that the trial court was biased and that he should be afforded a new trial with a different judge.
 {¶ 81} However, even if the trial court erred in some of its evidentiary rulings, that does not equate to bias. See Okocha v.Fehrenbacher (1995), 101 Ohio App.3d 309, 322 (a judge's rulings of law are not by themselves evidence of bias or prejudice). Furthermore, Ahmed neither moved to disqualify the trial judge nor moved for a new trial in light of the trial court's alleged bias.[7] See R.C. 2701.03
(provides mechanism for disqualifying a common pleas judge). If Ahmed believed that the trial judge was biased against him or his counsel, it was incumbent upon him to file an affidavit of interest, bias, prejudice, or disqualification with the clerk of the Ohio Supreme Court. See State v. Meza, Lucas App. No. L-03-1223, 2005-Ohio-1221, ¶ 31. "Since only the Chief Justice or his designee may hear a disqualification matter, a court of appeals is without authority to void the judgment of a trial court because of bias or prejudice of the judge." State v.DeMastry, 155 Ohio App.3d 110, 126, ¶ 78, citing Beer v. Griffith
(1978), 54 Ohio St.2d 440, 441-42. To the extent that Ahmed asks this court to vacate the trial court's judgment and remove the trial judge on remand, we have no authority to do so.
 {¶ 82} Moreover, we find no evidence in the record where the trial judge made any biased comments in the presence of the jury, tending to influence the jury. Viewing the entire proceedings as a whole, we see nothing to suggest that the trial court harbored hostility or ill will toward Ahmed or his counsel. Accordingly, we cannot say that the trial judge deprived him of a fair trial.
 {¶ 83} The seventh assignment of error is overruled.
 Exclusion of Defense Exhibits {¶ 84} In his eighth assignment of error, Ahmed argues that the trial court erred in excluding numerous defense exhibits.
 {¶ 85} The decision to admit or exclude relevant evidence rests within the sound discretion of the trial court. State v. Robb, 88 Ohio St.3d 59,68, 2000-Ohio-275. Accordingly, a reviewing court will not reverse a trial court's decision unless it was unreasonable, arbitrary, or unconscionable. State v. Adams (1980), 62 Ohio St.2d 151, 157. An error in the admission or exclusion of evidence is properly considered harmless error if it does not affect a substantial right of the accused. State v.Condon (2003), 152 Ohio App.3d 629, 655, ¶ 80; see, also Crim.R. 52(A).
 {¶ 86} Ahmed refers to 12 separate instances where the trial court refused to admit certain defense exhibits. He claims that the trial court wrongly concluded that the evidence was either irrelevant or cumulative to other exhibits admitted by the State, and he maintains that he was prejudiced by their exclusion. We disagree.
 {¶ 87} "Relevant evidence" is defined by Evid.R. 401 as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Further, Evid.R. 403(B) provides that relevant evidence may be excluded if its probative value is outweighed by considerations of undue delay, or needless presentation of cumulative evidence.
 {¶ 88} First, Ahmed refers to a series of exhibits relating to his defense on specific counts of the indictment, of which he was acquitted. See Def. Ex. 105, 131-133. Because he was acquitted of these counts, we find no prejudice by the trial court's exclusion.
 {¶ 89} Next, Ahmed complains that the trial court improperly excluded a large tablet, documenting his counsel's summation of the counts and various victims' testimony during the trial. Contrary to Ahmed's assertion, the tablet was not substantially similar to the chart offered by the State. While the State's chart documented each count, victim, and basis of the offense, the defense tablet selectively characterized victims' testimony according to the interpretation of defense counsel. Thus, we find no abuse of discretion by its exclusion.
 {¶ 90} As to the remaining exhibits, we find that the trial court properly determined that the evidence was either irrelevant or cumulative to other properly admitted exhibits. For instance, Ahmed sought to introduce copies of sign-in sheets when the trial court had already admitted the originals. Likewise, we cannot say that the trial court abused its discretion in excluding copies of civil complaints filed by two victims. The specific claims alleged by the victims and the form of the complaint were irrelevant. Similarly, we find that the defense expert's curriculum vitae constituted irrelevant and cumulative evidence because his qualifications were not disputed and the expert had testified at great length as to his education, experience, and background. We further find no merit to Ahmed's contention that the search warrant executed for Ahmed's Parma office should have been admitted. We fail to see how the admission of the search warrant would have assisted Ahmed's defense.
 {¶ 91} With regard to the evidence supporting Ahmed's claim of prosecutorial misconduct, we find no abuse of discretion in the court's refusal to admit the exhibits. Ahmed complains that the trial court improperly redacted portions of an email sent from C.C. to Ahmed, which referred to the prosecutor and his alleged misconduct. However, defense counsel agreed to the redaction at trial, thereby waiving any argument on appeal. Further, the trial court admitted a letter from Southwest Hospital stating that Ahmed never had privileges at the hospital. Thus, the exclusion of the letter from Ferrante, attesting to the same fact, was cumulative to the Southwest Hospital letter.
 {¶ 92} Accordingly, we overrule the eighth assignment of error.
 Sexual Battery Counts {¶ 93} In his ninth assignment of error, Ahmed argues that there was insufficient evidence to support his conviction for five counts of sexual battery, involving five separate victims.[8]
 {¶ 94} Ahmed was convicted of sexual battery under R.C. 2907.03, which provides in relevant part:
(A) No person shall engage in sexual conduct with another, notthe spouse of the offender, when any of the following apply:
* *
(2) The offender knows that the other person's ability to appraise thenature of or control the other person's own conduct is substantiallyimpaired.
 (3) The offender knows that the other person submits because the otherperson is unaware that the act is being committed."
 {¶ 95} Further, R.C. 2907.01 defines sexual conduct as follows:
"(A) `Sexual conduct' means vaginal intercourse between a male andfemale; anal intercourse, fellatio, and cunnilingus between personsregardless of sex; and, without privilege to do so, the insertion,however slight, of any part of the body or any instrument, apparatus, orother object into the vaginal or anal cavity of another. Penetration,however slight, is sufficient to complete vaginal or anal intercourse."
 {¶ 96} According to Ahmed, the State failed to prove that he acted "without privilege" in each incident involving the insertion of his fingers or another instrument inside each victim. He claims that the evidence was undisputed that the conduct giving rise to each count of sexual battery "mimicked the procedure necessary to perform a pelvic exam." As a result, he contends that the State was required to prove that he obtained sexual gratification while conducting a proper medical examination. We disagree.
 {¶ 97} First, contrary to Ahmed's assertion, the State produced evidence that he exceeded the boundaries of providing medical treatment and engaged in sexual conduct with each victim. While we agree that Ahmed utilized the internal examination as his opportunity to sexually assault the victims, we find no evidence in the record that each act was part of a proper medical procedure. Indeed, Dr. Stewart Friedman, the State's expert witness on obstetrical and gynecological care, testified that there is no medical reason for a doctor to lubricate a patient naturally with the doctor's fingers. Likewise, he stated that, absent an extremely rare hormonal dysfunction, there is no need to touch a woman's clitoris during an examination. Furthermore, Dr. Stewart testified that, in his twenty-five years of practice, he did not believe any situation during a medical examination could be construed as sexual in light of his demeanor and rapport between himself and his patients.
 {¶ 98} Each victim testified as to Ahmed's actions during the medical examination and the circumstances surrounding the offense. J.J. testified that, after Ahmed complimented her on having a beautiful clitoris, he rubbed it back and forth and asked whether that made her "wet." When J.J. responded in shock, he immediately left the room. Similarly, A.F. testified that, while Ahmed was feeling her ovaries, he "kept brushing back and forth on [her] G spot, as you would with your husband or your boyfriend during foreplay." The victim further testified that, when she pulled back and sat up, he pressed his erection against her knees. Likewise, S.M. testified that Ahmed rubbed her clitoris and entered her vagina with his fingers, bringing her to a climax within a matter of seconds.
 {¶ 99} As for the remaining two victims, A.G. and D.B., each testified that Ahmed inserted his bare fingers into her vagina, moving them in such a way to naturally lubricate her. A.G. further testified that Ahmed caressed her nipple while moving his fingers inside her vagina. D.B. also testified that Ahmed "moved his fingers back and forth over her clitoris." When she realized what he was doing, she quickly sat up and covered herself. D.B. further testified that Ahmed ended the examination by telling her that "if he was single, he would come to my house * * * and that he could probably get me off at least 11 times."
 {¶ 100} Finally, the victims testified that Ahmed's actions felt "sexual" and that there was no apparent medical reason for him to rub their clitoris.
 {¶ 101} To the extent that Ahmed implies that the victims were not credible, we find his argument misplaced. To meet the sufficiency requirement, credibility is not an issue. Rather, the State must provide sufficient evidence which, if believed, would result in a conviction.Thompkins, supra. Our review of the record reveals that the testimony of each victim, if believed, satisfied the elements of sexual battery. Accordingly, the trial court properly denied Ahmed's motion for an acquittal.
 {¶ 102} The ninth assignment of error is overruled.
 Maximum and Consecutive Sentences {¶ 103} In his tenth assignment of error, Ahmed argues that the trial court failed to make the necessary statutory findings and to provide its reasons, supporting the imposition of maximum and consecutive sentences on the rape and sexual battery counts. We agree.
 {¶ 104} In imposing consecutive prison terms for convictions of multiple offenses, the trial court must make certain findings enumerated in R.C. 2929.14(E)(4). According to this statute, a court may impose consecutive sentences only when it concludes that the sentence is (1) necessary to protect the public from future crime or to punish the offender; (2) not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public; and (3) the court finds one of the following: (a) the crimes were committed while awaiting trial or sentencing, under sanction or under post-release control; (b) the harm caused by multiple offenses was so great or unusual that a single prison term would not adequately reflect the seriousness of the offense; or (c) the offender's criminal history demonstrates that consecutive sentences are necessary to protect the public from future crime. R.C. 2929.14(E).
 {¶ 105} The trial court must also state its reasons on the record, supporting each finding. State v. Comer, 99 Ohio St.3d 463, 469,2003-Ohio-4165. Moreover, "a trial court must clearly align each rationale with the specific finding to support its decision to impose consecutive sentences." Id. These findings and reasons must be articulated by the trial court so an appellate court can conduct a meaningful review of the sentencing decision. Id., citing, Griffin 
Katz, Sentencing Consistency: Basic Principles Instead of Numerical Grids: The Ohio Plan (2002), 53 Case W.Res.L.Rev. 1, 12.
 {¶ 106} Our review of the record reveals that the trial court failed to follow the statutory requirements of R.C. 2929.14(E)(4) and2929.19(B)(2)(d) in imposing consecutive sentences. First, in regard to the imposition of consecutive sentences on the rape counts, the trial court failed to make any finding regarding the proportionality of consecutive sentences to the seriousness of Ahmed's conduct and to the danger that he poses to the public. Second, the trial court failed to provide any reason, related to the offenses, as to why the harm caused was so great and unusual.[9] Furthermore, in imposing consecutive sentences on the sexual battery counts, the trial court neglected to provide any reasons supporting its findings. Finally, although the written sentencing order indicates that the sentences imposed on the rape and sexual battery counts were to run consecutively, the trial court never made such a finding at the sentencing hearing. See, Comer, supra (sentencing court must make findings on the record at the time of sentencing).
 {¶ 107} Furthermore, when imposing more than a minimum sentence on an offender who has not previously served a prison term, the trial court is required to find that a minimum sentence "would demean the seriousness of the offender's conduct or not adequately protect the public from future crime by the offender or others." R.C. 2929.14(B); Comer, supra; Statev. Edmonson (1999), 86 Ohio St.3d 324, 326. Here, the trial court made no such finding in imposing a maximum sentence on the rape counts, despite the fact that Ahmed was a first offender and had never served a prison term. See R.C. 2929.14(B). Moreover, although the trial court made such a finding in regard to the sexual battery counts, we find that it failed to comply with R.C. 2929.19(B)(2)(d) and state its reasons, supporting its findings that Ahmed had committed the worst form of sexual battery and that he posed the greatest likelihood of recidivism.
 {¶ 108} Accordingly, we sustain the tenth assignment of error.[10]
 Ethnic Comments Made During Voir Dire {¶ 109} In his eleventh assignment of error, Ahmed argues that he was deprived of a fair trial because of comments made during voir dire relating to his Middle-Eastern heritage and Muslim faith. Although he acknowledges that such statements were initiated by his counsel and followed by the State, he contends that such comments constitute plain error and require a new trial pursuant to the recent decision of the Ninth District Court of Appeals in State v. Attalla, 157 Ohio App.3d 698,2004-Ohio-3414. However, we find Attalla distinguishable from the instant case and Ahmed's reliance on this case misplaced.
 {¶ 110} First, contrary to Ahmed's representation, Attalla does not stand for the broad proposition that any comments regarding ethnicity or religion made during voir dire are grounds for a new trial. Rather, the Ninth District addressed the specific issue of whether Attalla's defense counsel was ineffective for failing to object to the prosecutor's questions concerning his religion and ethnicity when it was done in such a way as to create bias among the entire jury pool. The court further found that defense counsel added to the error in continuing the same line of questioning in a manner which created bias and prejudice in the minds of the potential jurors. Unlike the facts of Attalla, we find that defense counsel and the prosecutor properly commented and asked questions relating to Ahmed's ethnicity and religion and that it was not done in a manner to create bias, prejudice, or an unfair attitude toward Ahmed. SeeState v. Jones (1984), 20 Ohio App.3d 331, 332 (holding that race, ethnicity and religious biases are proper subjects of voir dire).
 {¶ 111} Moreover, under the invited error doctrine, Ahmed has waived any argument pertaining to this issue because defense counsel initiated and pursued this line of questioning during voir dire. See State ex rel.Kline v. Carroll, 96 Ohio St.3d 404, 2002-Ohio-4849; State v. Smith,148 Ohio App.3d 274, 2002-Ohio-3114, ¶ 30 ("a party is not entitled to take advantage of an error that he himself invited or induced").
 {¶ 112} Accordingly, the eleventh assignment of error is overruled.
 Fifth and Sixth Amendment Rights {¶ 113} Ahmed claims in his twelfth assignment of error that the State improperly commented on his Fifth and Sixth Amendment rights throughout the trial.
 {¶ 114} First, Ahmed argues that the State improperly commented on his Sixth Amendment right to counsel by referring to his "civil attorney" and the number of attorneys representing him during trial. However, we find no authority, nor does Ahmed cite any, that prohibits a party from commenting on the fact that defendant has counsel. Moreover, to the extent that Ahmed claims that such comments prejudiced his defense, we disagree. Ahmed elicited testimony from numerous victims that they had filed civil suits against him. Thus, we find no prejudice in the State's reference to the fact that he had counsel in the civil proceedings. Further, we cannot say that the State's isolated reference to his team of trial attorneys during closing argument prejudiced him.
 {¶ 115} Next, we find no merit to Ahmed's contention that the State improperly commented on his decision not to testify. While we recognize that a prosecutor's remarks concerning a defendant's decision not to testify may be grounds for a new trial, we find no evidence in the instant case supporting such a conclusion. See State v. Thompson (1987),33 Ohio St.3d 1, 4. Here, Ahmed takes the prosecutor's closing remarks out of context and misconstrues them. To the extent that the State remarked on the defense's failure to present evidence that it had promised to introduce, we find no error. See State v. Twyford,94 Ohio St.3d 340, 2002-Ohio-894. Moreover, the prosecutor's remark on the lack of evidence regarding Ahmed's qualifications to treat psychological disorders does not constitute an attack on his Fifth Amendment right not to testify. We find that the prosecutor did not refer to matters solely within Ahmed's knowledge. See Twyford, supra. Accordingly, because the evidence could have been presented through other witnesses, we fail to see how it implicated his right not to testify.
 {¶ 116} Even assuming arguendo that the prosecutor's comments were improper, such comments neither materially prejudiced Ahmed nor denied him a fair trial. There is no evidence that the jury improperly inferred that Ahmed was guilty of the charges based on his decision not to testify.
 {¶ 117} Accordingly, the twelfth assignment of error is overruled.
 Excited Utterances Testimony {¶ 118} In his thirteenth assignment of error, Ahmed argues that the court erred in finding that the hearsay testimony of various witnesses qualified as "excited utterances." He claims that the court improperly allowed the State to present this testimony as corroborating evidence of the victims' testimony, in order to convict him on numerous counts of sexual imposition pursuant to R.C. 2907.06.[11]
 {¶ 119} In general, the admission of evidence is within the discretion of the trial court, and the court's decision will be reversed only upon a showing of an abuse of discretion. State ex rel. Elsass v. Shelby Cty.Bd. of Commrs., 92 Ohio St.3d 529, 533, 2001-Ohio-1276. "Abuse of discretion" implies that the court acted in an unreasonable, arbitrary, or unconscionable manner. State v. Herring, 94 Ohio St.3d 246, 255,2002-Ohio-796.
 {¶ 120} Ahmed refers to 16 instances in the record where the trial court allegedly erred in allowing hearsay testimony under the "excited utterance" exception. However, Ahmed complains of testimony supporting counts of gross sexual imposition, for which he was acquitted or where no hearsay was admitted. See Tr. 1963, 2132, 2326, 2588, 2645, 2814, and 2808. Thus, regardless of the admissibility of the evidence, we find no prejudice. Additionally, Ahmed challenges testimony which was admitted at trial without objection. See Tr. 3151. Thus, he has waived all but plain error. However, we decline to invoke the plain error doctrine in this situation where other corroborating evidence was admitted, supporting his conviction for sexual imposition.
 {¶ 121} Next, as to the remaining cited instances, we find no abuse of discretion. Evid.R. 803(2) allows the admission of hearsay under the "excited utterance" exception, which is defined as, "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."
 {¶ 122} For a statement to be admissible as an excited utterance, (1) there must have been an event startling enough to produce a nervous excitement in the declarant; (2) the statement must have been made while under the stress of excitement caused by the event; (3) the statement must have related to the startling event; and (4) the declarant must have personally observed the startling event. State v. Taylor (1993),66 Ohio St.3d 295, 300-301; State v. Duncan (1978), 53 Ohio St.2d 215, paragraph one of the syllabus. "There is no per se amount of time after which a statement can no longer be considered to be an excited utterance. The central requirements are that the statement must be made while the declarant is still under the stress of the event and the statement may not be a result of reflective thought." Taylor, supra at 303.
 {¶ 123} With the exception of three instances, we find that the testimony Ahmed complains of clearly meets the requirements for an excited utterance. In these instances, the victims made their statements immediately following the offense while they were upset, crying, or very emotional. See Tr. 2247, 2362, 2438. Given the nature of the offenses, the violation of trust in the physicianpatient context, and the timing under which the statement was made, we find no abuse of discretion by the trial court's admission of the testimony.
 {¶ 124} In regard to the two instances where the victims did not immediately report the offenses, we still cannot say that the trial court abused its discretion. The trial court has wide discretion in determining whether the declarant was under the stress of the event when the out-of-court statement was made. State v. Fowler (1985),27 Ohio App.3d 149, 151, Duncan, supra. Here, the testimony revealed that the victims were extremely upset and, according to the witnesses, their demeanor changed when the subject of their medical treatment with Ahmed was raised. See Tr. 2540, 2767. The witnesses further testified that the victims became upset and then made the statement. Thus, in light of the victims' mental state, there is sufficient evidence that the victims were still under the stress of the event.
 {¶ 125} Finally, Ahmed challenges the admission of hearsay testimony as an excited utterance when there was no testimony that the declarant was upset or emotional at the time that she made the statement. However, the record reveals that the victim made the statements to her boyfriend immediately following the medical appointment. Again, given the nature of the offenses and the timing of the victim's statements, we find no abuse of discretion. But, even if we were to find that the testimony was improperly admitted, the error was harmless.
 {¶ 126} Contrary to Ahmed's assertion, the witness's hearsay testimony was not the only corroborative evidence offered supporting the count of sexual imposition. See R.C. 2907.06(B). In State v. Economo,76 Ohio St.3d 56, 1996-Ohio-426, the Ohio Supreme Court explained the corroboration requirement for a conviction of sexual imposition as follows:
"The corroborating evidence necessary to satisfy R.C. 2907.06(B) neednot be independently sufficient to convict the accused, and it need notgo to every essential element of the crime charged. Slight circumstancesor evidence which tends to support the victim's testimony issatisfactory. The corroboration requirement of R.C. 2907.06(B) is athreshold inquiry of legal sufficiency to be determined by the trialjudge, not a question of proof, which is the province of the factfinder."
 {¶ 127} In the instant case, it was undisputed and supported by the medical records that the victim was a patient of Ahmed's and that she had been seen by him on the date of the offenses. Moreover, the victim's boyfriend testified that he drove her to every appointment with Ahmed, and he became concerned based on what she told him after each appointment. (Tr. 2203). Based on this evidence, we find that there was sufficient "other evidence" supporting the offense.
 {¶ 128} Accordingly, the thirteenth assignment of error is overruled.
 Visual Aid of Trial Testimony During Closing Arguments {¶ 129} Ahmed claims in his fifteenth assignment of error that the trial court abused its discretion in prohibiting defense counsel from displaying excerpts of witnesses' trial testimony during closing arguments. However, the record reveals that the court allowed defense counsel to read the trial testimony. Thus, because the court allowed defense counsel to read the transcribed testimony during closing argument, the visual display would have been cumulative to counsel's statements. Accordingly, we find no abuse of discretion nor prejudice to Ahmed.
 {¶ 130} The fifteenth assignment of error is overruled.
 Cumulative Error {¶ 131} In his final assignment of error, Ahmed contends that the cumulative effect of errors committed during his trial requires reversal of his conviction. Having already found that any errors committed during trial were harmless or nonprejudicial, we cannot say that he was denied a fair trial. See State v. Dixon, 101 Ohio St.3d 328, 345, 2004-Ohio-1585. "`Such errors cannot become prejudicial by sheer weight of numbers.'" Id., quoting State v. Hill, 75 Ohio St.3d 195, 212, 1996-Ohio-222.
 {¶ 132} Accordingly, we overrule the final assignment of error.
Conviction affirmed, sentence vacated, and case remanded for resentencing.
The sentence is vacated, and this cause is remanded for resentencing.
It is ordered that appellant recover of appellee his costs herein taxed.
It is ordered that a special mandate issue from this court to the Cuyahoga County Court of Common Pleas to carry this judgment into execution. A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Calabrese, Jr., J. and Gallagher, J. Concur.
[1] The State dismissed three counts of sexual imposition at the close of its case.
[2] However, in cases of homicide, the element referred to in division (A)(1) is limited to the act that causes death, or the physical contact that causes death, or the death itself. R.C. 2901.11(B).
[3] Although the indictment was consolidated with a prior indictment involving offenses that occurred in the same county as the grand jury, the consolidation does not cure the original defective indictment.
[4] The unique circumstances included: (1) a victim having cerebral palsy and hydrocephalus, a condition involving water on the brain; (2) a victim returning but refusing to undress for her subsequent exam; and (3) a victim believing that she had "imagined" the previous incident involving the sexual contact.
[5] Although Ahmed's challenges his convictions for the sexual battery offenses involving C.C., counts 47 and 49, he fails to make any argument in support of his assertion that these convictions should be reversed. See App.R. 12(A) and 16(A). Nonetheless, our review of the record reveals that these convictions are supported by the sufficiency and the weight of the evidence based on C.C.'s testimony. We further note that, because these offenses were based on the same conduct giving rise to the rape offenses, the trial court properly merged the offenses with the rape convictions at the time of sentencing.
[6] The record reveals that Southwest Hospital notified the State prior to trial that it had no record of Ahmed being a member of the medical staff. Although this letter was not admitted as an exhibit, the trial court sealed the letter and made it part of the record on appeal.
[7] Although defense counsel proffered that the trial court's rulings demonstrated a bias in favor of the State, this proffer was made outside the presence of the jury and the judge. Furthermore, a proffer does not negate the express requirements of R.C. 2701.03 for establishing bias.
[8] This assignment of error does not include the two counts of sexual battery involving C.C. Rather, Ahmed challenges his conviction on counts 2, 3, 4, 25, and 44 of the indictment, involving five different victims.
[9] The trial court reasoned that the harm of the offenses was so great and unusual because of the number of victims who had to "bare their souls" in testifying against Ahmed. We fail to see how this reasoning relates to the harm of the specific offenses. Typically, most criminal cases involve victims testifying as to the circumstances of the offense. Although we recognize the sensitive nature of the victims' testimony in the instant case, we find the trial court's reliance on this factor misplaced for purposes of justifying consecutive sentences.
[10] Our disposition of this sentencing error renders moot the thirteenth assignment of error which alleges a Sixth Amendment violation under Blakely.
[11] R.C. 2907.06(B) states: "No person shall be convicted of a violation of this section [sexual imposition] solely upon the victim's testimony unsupported by other evidence."